IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MICHAEL R. ROMERO, #304893 | * | |
| Plaintiff, | | |
| v. | * | CIVIL ACTION NO. DKC-09-2371 |
| CO II BARNETT | * | |
| CO II HOKERS | | |
| SGT. REAGAN | * | |
| CAPTAIN PHIL SMITH | | |
| CHARLIE KEIM-MCE | * | |
| DELANUIEL EVANS | | |
| DR. COLIN OTTEY | * | |
| DR. ISAIS TESSEMA | | |
| PHYSICIAN'S ASSISTANT MOSS | * | |
| CORRECTIONAL MEDICAL SERVICES | | |
| Defendants. | * | |
| | *** | |

**MEMORANDUM OPINION**

Michael Romero ("Romero") filed this 42 U.S.C. 1983 prisoner civil rights action seeking compensatory and punitive damages, a preliminary injunction, declaratory judgment, and criminal prosecution.[1] The Complaint raises a panoply of claims against medical and correctional staff arising out of an alleged body cavity search and assault occurring at the Jessup Correctional Institution ("JCI") on January 8, 2007, and involves allegations of excessive force, denial of due process, loss of a prison job, denial of medical care, and punitive transfer to a higher security level prison. Paper No. 1.

All Defendants have been served. Medical Defendants Correctional Medical Services, Inc., Moss, Ottey, and Tessema have filed a dispositive motion and Romero has filed an Opposition.

---

[1] Romero has no free-standing right to seek the criminal prosecution of individuals. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also Otero v. United States Attorney General*, 832 F.2d 141 (11th Cir. 1987).

Paper Nos. 28 & 32. State Defendants Barnett, Hocker, Keim, Ragin, and Smith[2] have also filed a dispositive motion and Romero has filed an Opposition thereto.[3]  Paper Nos. 37 & 40.   The motions may be determined on the papers without hearing.  See Local Rule 105.6. (D. Md. 2010). For reasons to follow, the dispositive motions shall be granted in part and denied in part.

Fed. R. Civ. P. 56(c)(2) provides that summary judgment:

> should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the

---

[2] The docket shall be modified to reflect the correct spelling of the names of Defendants Adam Hocker, Quentin Ragin, and Charles Keim.

[3] A review of the docket shows that service of process was effected on Defendant Evans at

2

"affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). The multiple claims raised by Romero shall be addressed *seriatim*.

## APPLICATION OF FORCE

Romero claims that on January 8, 2007, while in the process of conducting a mass shakedown of JCI following an assault on correctional officers, Defendants Barnett, Hocker, and Ragin ordered him to submit to a body cavity search using foul, racially charged, and sometimes inaudible language. He asserts that these officers physically manhandled him, pushed him into the back wall of his cell, and ordered him to be handcuffed behind his back, even though Romero informed Barnett that there was a medical order affixed to his cell wall that required him to be handcuffed in the front due to a previous shoulder injury.

Romero contends that the three officers "attacked" him and physically forced his arms behind his back for cuffing, at which time his left shoulder "popped" and dislocated. He alleges that he was then placed in a chair in front of his cell.

In response, the State Defendants affirm by declaration that they do not remember Romero or do not recall any incident similar to the January 8, 2007 event he alleges. They generally deny ever entering an inmate's cell in an aggressive manner or using curse words during any routine shakedown search. They claim that they have never manhandled or attacked a prisoner and, unless Romero was behaving in a dangerous manner to prison staff or other inmates, he would have been handcuffed in front had he produced a relevant medical order. The State Defendants affirm that had such an incident and injury occurred, such as the ones Romero alleges, a record would have been

---

a home address on November 9, 2009. Paper No. 15. He has not, however, filed an answer.

made.[4] They argue that nothing in the record suggests that this incident was anything other than a routine shakedown search[5] and Romero's medical records do not demonstrate that he suffered severe injury. Defendant Keim affirms that he supervised Romero on a daily basis during this time and never observed any sign of injury or heard Romero complain of a medical problem.

In his opposition Romero reiterates his claims, by personal declaration, regarding Barnett, Ragin, and Hocker's "aggressive" actions in repeatedly "manhandling" him, using racial epithets, and disregarding a medical order in "plain view" which required Romero to be handcuffed in front.[6] He claims that as a result he dislocated his left shoulder. Romero again alleges that after this occurred he summoned Captain Smith, told him he thought his left shoulder had been dislocated by the three officers, and asked to be cuffed in front and to have the medical department contacted. Romero states that Smith indicated that he would check into it, but never did.[7] He asserts that after the cell search was completed, he was placed in his cell, his handcuffs were removed, and he could not move his left arm.

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm". *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This court must look at the need for

---

[4] Defendants state that during a shakedown search, officers have the inmate face the rear wall of the cell before the officers enter it. A strip search of the inmate is then conducted. After the strip search is completed, officers handcuff the inmate for the remainder of the search. Paper No. 37, Ex. D.

[5] The undersigned observes that the State Defendants do not raise a 42 U.S.C. § 1997(e)(1) exhaustion argument as an affirmative defense, suggesting some administrative record of the January 8, 2007 incident may exist. Indeed, Romero's Opposition shows that he filed administrative remedies and his grievances were presented at the institutional level and before administrative law and circuit court judges. Paper No. 40.

[6] A copy of the October 13, 2006 medical order, directing that Romero receive a medical assignment requiring handcuffing in front for one year, is attached. Paper No. 40, Ex. at 13.

[7] Romero has consistently alleged that he later summoned Lieutenant Williams and twice

4

application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *See Whitley v. Albers*, 475 U. S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *See Wilkens v. Gaddy*, 130 S. Ct. 1175, 1178-1179 (2010) (holding the core judicial inquiry when a prisoner alleges excessive force is not whether a certain quantum of injury was sustained, but rather whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id*.

Where, as here, there is a dispute of material fact as to whether the use of restraints was knowingly applied behind Romero's back in variance with a medical order to be cuffed in front and the objective record shows that he sustained an injury and required medical treatment and therapy for a sprained or dislocated shoulder, summary judgment shall be denied as to this claim.[8]

---

spoke to him about his medical needs. He claims that the matter was referred to another officer.

[8] The alleged offensive language used by Defendants Barnett, Ragin, and Hocker is not actionable under 42 U.S.C. § 1983. *See Barney v. Pulsipher*, 143 F.3d 1299, 1310 n. 11 (10th Cir. 1998); *see also McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987); *Cole v. Cole*, 633 F.2d 1083, 1091 (4th Cir. 1980); *Partee v. Cook County Sheriff's Office*, 863 F.Supp. 778, 781 (N.D. Ill.1994) (inmate's "allegations of verbal threats, racial epithets, and continued harassment" failed to meet objective component of Eighth Amendment).

MEDICAL CARE

Romero claims that as a result of the pain from the dislocation to left shoulder, he summoned Defendant Smith, informed him of what had transpired with Officers Barnett, Ragin, and Hocker, and asked him to be handcuffed in the front and to contact the medical department. He asserts that Smith indicated he would check into it, but never did so. Romero states that upon completion of the cell search, he was placed back in his cell, his handcuffs were removed, and he could not move his left arm. He claims that his request for emergency medical attention was communicated to various correctional officers, one of whom contacted the dispensary and was informed by Physician's Assistant ("P.A.") Moss to have Romero file a sick-call request as there was nothing Moss could do. Romero claims that he was forced to re-set his dislocated left arm himself.

The Complaint further alleges that on January 10, 2007, when Romero was summoned to the Medical Department to have blood drawn, he articulated his medical emergency to a nurse who referred him immediately to P.A. Moss. Moss examined Romero, prescribed a sling and took no further action to prescribe medication or x-rays. Romero claims that his left shoulder has not been the same since January 7, 2007, and he now suffers a "severe disability."

Romero also alleges that since his transfer from JCI to the North Branch Correctional Institution ("NBCI") in April of 2008, Drs. Ottey and Tessema have denied him treatment for his medical conditions (left shoulder, right knee, and Hepatitis C ("HVC"), which was being evaluated and cared for at JCI pursuant to appropriate treatment plans.

The State Defendants affirm that they do not remember Romero complaining of a dislocated shoulder and if informed of same, they would have contacted medical personnel. Defendant Smith maintains that he would never inform an inmate that he would check into a medical complaint and fail to do so.

6

The Medical Defendants contend that Romero received constitutionally adequate medical care as demonstrated by the record.[9] They allege that since January 7, 2007, Romero has submitted numerous sick-call forms complaining of shoulder, knee and HVC problems and was frequently examined by staff at JCI and NBCI. Paper No. 28.

For his part, Romero reiterates his Complaint allegations that P.A. Moss was told of the medical emergency, i.e., dislocated shoulder, on January 8, 2007, and he informed security staff that Romero would have to file a sick-call slip. He claims that he was initially refused medical care and it was not until January 10, 2007, when he was sent to the medical department on another matter, that he was able to have his left arm/shoulder treated with the application of a super sling. Paper No. 32. Romero contends that Moss did not provide any further treatment for his shoulder and it continues to cause him pain, is very weak, and self-dislocates. Romero also complains that Moss never addressed or treated his complaints of right knee problems, causing him to suffer additional injury and pain. Paper No. 32.

Finally, Romero claims that he did not receive proper care from Drs. Tessema and Ottey while confined at NBCI as they (1) failed to reinstate all medical orders issued at JCI; (2) denied him treatment for shoulder and knee problems, HCV, and liver pain; and (3) saw him in the medical department, but failed to provide him treatment. *Id*. The following information has been culled from the medical record and affidavits/declarations.

### Shoulder and Arm

---

[9] CMS argues that as a corporate entity, it cannot be held liable under § 1983. It is well settled law that a claimant may not recover against a municipality on a *respondeat superior* theory under § 1983. *See Monell v. Dep't of Social Services,* 436 U.S. 658, 690-695 (1978). To the extent the Complaint names CMS solely upon vicarious liability, circuit law is clear. Principles of municipal liability under § 1983 apply equally to a private corporation. Therefore, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of *respondeat*

The record shows that on January 8, 2007, Romero filed a sick-call form complaining that his left arm was sprained due to his being handcuffed behind his back. By affidavit P.A. Moss states that Romero was evaluated on January 10, 2007, and complained of pain and decreased range of motion ("ROM") of his left shoulder. He noted that he had "relocated" his shoulder but felt that he has suffered a sprain. He received a "super sling" for his arm and was referred to a P.A. for further evaluation and care. The Medical Defendants state that Romero was already receiving Motrin 600 mg. three times a day for his complaints of pain. On January 11, 2007, Romero was not escorted to the dispensary for his follow-up appointment because JCI was on lock-down. He filed another sick-call encounter form on January 15, 2007, requesting an x-ray of his left shoulder. Defendants claim that the form was not received until January 22, 2007 and Romero was scheduled for an evaluation by Moss on February 5, 2007, but refused to go to the appointment.

Romero was seen by Moss on March 6, 2007, for several complaints, including blood flow, feet, eyes, HCV testing, and a left shoulder problem. Moss's objective examination revealed no deformity of the shoulder, no neurovascular deficits, full ROM of the shoulder, and good musculoskeletal strength. An x-ray was ordered. On March 27, 2007, Dr. Motti Mulleta referred Romero to the physical therapy ("PT") department to undergo ultrasound therapy for his shoulder. Mulleta also renewed Romero's prescription for Motrin to treat his complaints of pain. On March 28, 2007, Romero underwent a shoulder x-ray and the results revealed no fractures to his shoulder. The physical therapist evaluation noted that objective findings of Romero's shoulder were inconsistent with his subjective complaints. The physical therapist recommended one or two visits for ultrasound therapy and putting Romero on a home exercise program.

---

*superior*. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982). CMS's Motion to Dismiss will be granted.

On April 15, 2007, Romero filed a sick-call request for an MRI of his shoulder. P.A. Moss evaluated Romero on April 23, 2007, and noted decreased ROM and reduced musculoskeletal strength of the shoulder. Moss referred Romero to the PT department for further evaluation.

On May 18, 2007, Romero was evaluated and a physical therapist recommended shoulder blade stabilization and exercises to relieve a suspected nerve impingement in Romero's shoulder. He received therapy in the form of therapeutic exercises from May 21, 2007 to July 25, 2007, when the PT "goals" were met.

The remaining portion of the record shows that Romero offered no complaints of shoulder pain until November 29, 2007, when he requested an MRI and PT for his left shoulder. In December 2007, he was prescribed Motrin and six weeks of PT were ordered despite a lack of instability or crepitus (cracking sound or grating feeling). Romero continued to request refills of his Motrin prescription and to inquire into the start date of his PT. In March of 2008, Defendant Moss increased the Motrin prescription. Romero was transferred to NBCI in April 2008, before the PT sessions for the shoulder could commence.

Soon after his NBCI transfer, Romero complained that his left shoulder "pops out" and caused him pain when he is cuffed behind his back. He requested to be cuffed in front. Romero was evaluated in the NBCI medical unit on April 14, 2008, and received Motrin and muscle rub for pain. Romero made several requests for a "soft tissue" x-ray of his shoulder and PT. On June 1, 2008, Nurse Practitioner Anna Hammond ordered an x-ray of Romero's left shoulder, which was performed and showed no abnormalities.

In response to his continuing sick-call forms of left shoulder pain, Dr. Ottey evaluated Romero on September 17, 2008. Romero complained that he had difficulty sleeping because of left shoulder pain, had numbness and tingling of the arm, and decreased ROM, and experienced

9

increased pain when handcuffed behind his back. Ottey ordered front cuffing, PT, and Motrin 800 mg. three times a day for shoulder pain. Romero received therapy from October 19, 2008, to January 18, 2009. His ROM and muscle tests were within functional limits despite his continued complaints of pain. On December 20, 2008, his Motrin was decreased in dosage.

On February 4, 2009, Romero complained of shoulder pain and the need for a medical mattress. He was evaluated by Ottey for the same complaints on April 10, 2009, and a medical mattress was ordered. On July 8, 2009, Romero was transferred to the Western Correctional Institution. One month later he filed a sick-call encounter form requesting a bottom bunk because of his shoulder and complained of severe shoulder pain. He was seen by P.A. Sparks on August 11, 2009 and referred to Dr. Tessema for further evaluation. On August 18, 2009, Romero was seen by Dr. Hubert Mickel and referred to Dr. Tessema for approval of a bottom bunk request. On September 3, 2009, his request for a bottom bunk was granted for one month and his referral to physical therapy was renewed.

On October 15, 2009, during a Chronic Care Clinic ("CCC") visit, Romero alleged that his left shoulder dislocated twice while he slept. He received a sling for his arm and his bottom bunk medical order was renewed for one year. The medical Defendants state that Romero has offered no further complaints of shoulder pain since October 15, 2009.

Knee

With regard to his complaint that he has not received treatment for his right knee since his transfer out of JCI, the record shows that Romero made his first complaint of right knee problems on March 17, 2008, while still confined at JCI. He requested a knee brace and was evaluated by P.A. Moss on March 19, 2008. Moss found the knee to be stable and concluded that a knee brace was not needed. Romero was again evaluated by Moss on March 25, 2008, at which time he told Moss that he tore a ligament to his knee and requested an MRI. Moss found that Romero has full ROM to the knee, the joint was stable, and there was only minimal tenderness over the area of Romero's medial cruciate ligament. Moss ordered an x-ray of Romero's right knee and referred him to a physician for further evaluation. On March 30, 2008, an x-ray was performed and the results proved negative for any bony injury. Before Romero could be evaluated by a JCI physician, he was transferred to NBCI. The next complaint regarding the knee was made on April 19, 2008, when Romero filed a sick-call request form asking for a soft tissue x-ray, claiming that he hyper-extended his knee. The medical Defendants state that Romero made repeated requests for a soft tissue x-ray. No such x-ray was ordered. Rather, the knee was examined several times over the course of July to September 2008. It was first noted that Romero was in no acute distress; later some swelling to the back of his knee and limited ROM were objectively seen. Nurse Timothy Burdock gave Romero an Ace wrap to use on his knee for ninety days. He was also seen by Nurse Teresa Brenneman and Dr. Ottey in September of 2008. Ottey noted some tenderness in the right knee and referred Romero to PT for evaluation and treatment. PT was provided for one month and when discharged from PT, Romero claimed that he no longer had pain in his knee unless he hyper-extended it. He continued to complain of knee pain and requested an MRI. Romero was seen by Ottey in December of 2008. The examination revealed no abnormalities.

On June 27, 2009, Romero informed Dr. Ottey that he had fallen in the shower two weeks earlier and had hyper-extended his knee. Romero indicated that an MRI taken in California in 1998 had revealed an anterior cruciate ligament ("ACL") injury. He reported that his knee "gives out" sometimes. Ottey's examination revealed no knee swelling, an intact gait and balance, normal reflexes, and no skeletal tenderness or joint deformity. Ottey ordered a knee brace for Romero.

Soon after his transfer from NBCI to WCI on July 8, 2009, Romero filed an emergency sick-call request complaining about his right knee and the failure to receive his knee brace. He was seen by a WCI nurse, who noted no knee swelling, normal gait, and active ROM of the knee. Romero was referred to a physician for further evaluation. On August 24, 2009, Dr. Hubert Mickel evaluated Romero, who told the physician that he injured his knee when falling on ice. Romero was referred to PT and given a knee brace for one year. On September 3, 2009, Mickel again evaluated Romero in the CCC. Romero claimed that an MRI, conducted in 1996 or 1997, showed a torn ACL. A consent form was obtained to retrieve the MRI record from the California State Department of Corrections.[10] Mickel referred Romero to PT and signed a medical order for a bottom bunk.

The medical Defendants claim that despite normal physical examinations, Romero continued to complain of knee pain. On October 15, 2009, Mickel prescribed Neurontin, a medication used to treat neuropathy, for Romero's subjective complaints of chronic pain, and renewed Romero's medical order for a bottom bunk for one year. Defendants state, however, that Romero frequently did not come to the pharmacy to take his Neurontin and he has not complained about knee pain since October 15, 2009.

## Hepatitis C

---

[10] In response the California Department of Corrections indicated that the records had been destroyed.

Romero has been diagnosed with Hepatitis C ("HCV"). From July 14, 2006 to December 29, 2006, he was treated with Ribavirin and Pagasys (Interferon), a combination drug regimen for HCV treatment. Following this regimen, his blood testing showing an undetectable viral load and liver function tests within normal limits. Romero was discharged from the HCV clinic on January 3, 2008. The medical Defendants claim that although Romero frequently complains of pain in the right upper quadrant of his abdomen and symptoms of dyspepsia, his blood tests show that there is no damage to his liver and his HCV viral load remained undetectable since his HCV treatment.

## ANALYSIS

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia,* 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment ." *De Lonta v. Angelone,* 330 F.3d 630, 633 (4th Cir. 2003), citing *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). To state an Eighth Amendment claim for denial of medical care, Romero must demonstrate that the actions of Defendants (or their failure to act) amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

As noted above, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The second component of proof requires "subjective recklessness" in the face of the serious medical

condition. *Farmer,* 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce,* 129 F.3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter …becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center,* 58 F.3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer,* 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris* 240 F.3d 383 (4th Cir. 2001), citing *Liebe v. Norton,* 157 F.3d 574, 577 (8th Cir. 1998).

Records before the court demonstrate that medical contractors have not acted with indifference to Romero's medical needs. The record reveals that Romero was initially evaluated by medical staff within forty-eight hours of his sick-call request and received a sling for his left shoulder injury. The materials also show he was provided continuing treatment for pain in his arm and knee. He was provided repeated x-rays, physical examinations, analgesic medication, and PT. His subjective complaints of limited ROM were belied by the objective findings of PAs, nurses, doctors and therapists. Further, his HCV has been successfully treated with medication resulting in normal liver studies. Romero simply disagrees with the medical judgment of his health care providers. This disagreement does not provide the framework for a federal civil rights complaint. *See Russell v. Sheffer,* 528 F.2d 318 (4th Cir. 1975). The court simply cannot find from the medical records before it that the medical care received by Romero was so egregious as to constitute an

Eighth Amendment violation.[11]

## JOB TERMINATION

Romero asserts that he was issued a notice of infraction on September 4, 2007, and suspended from his job at the Maryland Correctional Enterprise ("MCE") pending resolution of the infraction. He states that he received an informal resolution and was ordered back to work on September 24, 2007. Romero alleges, however, that on that same date Defendant Evans threatened to terminate him from his job.[12] He claims that he spoke to Defendant Keim and both Keim and Evans "conspired" to arbitrarily terminate him from his MCE job.

Defendant Keim affirms that Romero was employed by MCE at JCI for more than a year. On September 4, 2007, he was charged with possessing tobacco as he was leaving MCE and suspended from his job duties. Several days later, Keim was informed by Romero that he had "beaten" the charge and wanted to return to his job. Keim affirms that he arranged for Romero to return to work on September 24, 2007, but was directed by the MCE regional manager not to allow Romero to return regardless of the outcome of the disciplinary hearing. Keim states that he did not conspire to deprive Romero of the job; rather, he was inclined to allow him to return to work.

In order to be entitled to the protections of the Due Process Clause, Romero must have a constitutionally protected liberty interest at stake; if so, the question becomes what due process protections are required. In its decision in *Sandin v. Conner*, 515 U. S. 472 (1995), the Supreme Court sought to focus attention on the nature of the deprivation, stating that a liberty interest may

---

[11] The court finds that under the facts Romero has failed to show that Captain Smith was deliberately indifferent to a serious medical need.

[12] Romero claims that he filed an Administrative Remedy Procedure ("ARP") grievance against Evans in August of 2007 for threatening to terminate him from his MCE job.

15

be created when State action imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Thus, *Sandin* requires that the due process inquiry focus on the type of deprivation. *Id*.

Following the reasoning of the Supreme Court in *Sandin*, it appears that no liberty interest is implicated in a decision relating to prison job assignments.[13] *See Penrod v. Zavaras*, 94 F.3d 1399, 1407 (10th Cir. 1996); *Frazier v. Coughlin*, 81 F.3d 313 (2d Cir. 1996) (per curiam); *Bulger v. United States Bureau of Prisons*, 65 F.3d 48, 49 (5th Cir. 1995). An inmate's assignment to or removal from an institutional job is not an atypical event, but represents a commonplace occurrence in the day-to-day operations of a prison. The fact that Romero was removed from his MEC work detail cannot be said to impose a significant hardship on him. Therefore, this claim against Defendants Keim and Evans is subject to dismissal.

## TRANSFER TO HIGHER SECURITY LEVEL PRISON

The Complaint avers that all MCE inmate workers were informed that MCE Management would do everything it could do keep an inmate from being transferred to the North Branch Correctional Institutition ("NBCI") if the inmate qualified as a maximum security inmate and maintained their MCE job.[14] Romero claims that Defendant Evans thus knew that any MCE inmate would be transferred to NBCI if he was terminated from his job. He asserts that he was arbitrarily transferred to NBCI on April 5, 2008, without receiving due process. Romero seemingly states that

---

[13] Prior to *Sandin*, this Circuit held that inmates did not have a constitutionally protected right to an institutional job or to remain in a particular job once assigned. *See Altizer v. Paderick*, 569 F. 2d 812, 815 (4th Cir. 1978); *Bowring v. Godwin*, 551 F.2d 44, 48 n. 2 (4th Cir. 1977); *see also Awalt v. Whalen*, 809 F. Supp. 414, 416-17 (E.D. Va. 1992).

[14] NBCI was, at that time, the newly-constructed maximum security facility in Cumberland, Maryland.

16

the conditions of NBCI were more severe than JCI as he did not receive the medical treatment he was receiving at JCI after he was transferred, and he was "deprived [of] his Native American religion from April 5, 2008 to August 6, 2009."[15]

The State Defendants maintain that Romero had no constitutional right to remain at JCI, as the transfer does not implicate a liberty interest under *Olim v. Wakinekona*, 461 U.S. 238 (1983); *Meachum v. Fano*, 427 U.S. 270 (1976); and *Paoli v. Lally*, 812 F.2d 1489 (4th Cir. 1987). This argument would suffice but for Romero's allegation that the conditions at NBCI were more onerous than those he experienced at JCI. The State Defendants have not come forward with any specific facts or legal analysis regarding Romero's housing assignment for purposes of the necessary review under *Sandin* and *Wilkinson v. Austin*, 545 U.S. 209 (2005).[16] Therefore, due to the inadequacy of the record, the court is without necessary information to conduct an analysis into whether Romero's housing at NBCI imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Summary judgment shall be denied as to this claim.

## CONCLUSION

For the aforementioned reasons the case shall proceed solely as to Romero's claims regarding the application of force and prison transfer. Romero shall be granted an additional period

---

[15] It does not appear that Romero was raising his religious worship claim as an independent First Amendment claim; instead, he raised it as part of his Fourteenth Amendment claim to show the severity of the conditions of his confinement at NBCI versus JCI. Defendants have not responded to the claim under either a Fourteenth or First Amendment analysis. To the extent he wishes to present it as a First Amendment religious worship claim, Romero may do so in a separate complaint.

[16] *Wilkinson* holds that in order to measure whether an inmate's' new custodial situation imposes "an atypical and significant hardship within the correctional context" it must be measured against a "baseline." *Wilkinson,* 545 U.S. at 223-224. While *Wilkinson* did not establish what this "baseline" should be, the Fourth Circuit uses the conditions "imposed on the general population" as the baseline for this analysis. *See Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997).

of time to seek the appointment of counsel. A separate Order follows.


Date:      August 2, 2010             _____/s/_____
                                      DEBORAH K. CHASANOW
                                      United States District Judge